IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

Scott KULIKOWSKI,
        Defendant.

Criminal Action Nos. 15-19, 15-22

# MEMORANDUM OPINION

Conti, Chief District Judge

## I. Introduction and Procedural History

On February 10, 2015, the court held a de novo hearing to determine whether defendant Scott Kulikowski ("Kulikowski") should be detained pretrial. After a review of the detention hearing before the magistrate judge, the pretrial services report, the evidence presented at the hearing, and the arguments of counsel, the court determined that Kulikowski should be detained without bond pending trial. This memorandum opinion sets forth the reasons for the court's decision, which were detailed on the record.

On January 12, 2015, the government filed two criminal complaints against Kulikowski.[1] (ECF No. 1.) The complaints alleged that Kulikowski conspired to possess with intent to distribute and distribute 500 grams or more of cocaine in violation of 21 U.S.C. § 846 (Crim. No. 15-19), and conspired to commit a Hobbs Act robbery in violation of 18 U.S.C. § 1951(a) and possessed a firearm in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c) (Crim. No. 15-22). On January 13, 2015, Kulikowski made an initial appearance and was temporarily detained. (ECF No. 14.) On January 14, 2015, the magistrate judge held a preliminary examination and a detention hearing at both case numbers. At Criminal No. 15-19, the magistrate judge found that probable cause existed to support the drug conspiracy charge. (ECF No. 34.) With respect to the charges at Criminal No. 15-22, the magistrate judge

---

[1] The complaints were filed at Magistrate Nos. 15-29 and 15-30, which were merged respectively into Criminal Action Nos. 15-22 and 15-19.

found that probable cause existed for the Hobbs Act conspiracy, but probable cause did not exist for the firearm charge. (ECF No. 20.) The magistrate judge further determined that Kulikowski should be released on a $30,000 unsecured bond with a number of conditions, including a curfew. (Prelim. Ex. Hr'g Tr. 120:14–121:13, Jan. 14, 2015, ECF No. 44-1.) The government orally moved to stay the order, and the magistrate judge denied the motion. (*Id.* at 124:6–11.) The government filed a motion and a supplement with this court for an emergency stay of the pretrial release order and a de novo hearing.[2] (ECF Nos. 17, 18.)

On January 14, 2015, the court held a hearing on the government's emergency motion and granted the stay. The de novo hearing was held, after a continuance requested by Kulikowski, on February 10, 2015. On February 3, 2015, a grand jury returned two indictments against Kulikowski. At Criminal No. 15-19, the indictment charges Kulikowski with conspiracy to possess with intent to distribute and distribute five kilograms or more of cocaine. At Criminal No. 15-22, the indictment charges Kulikowski with conspiracy to commit the Hobbs Act robbery and possession of a firearm in furtherance of a crime of violence.

## II. Legal Standards

A judicial officer must determine whether a defendant should be detained or released pending trial. 18 U.S.C. § 3142(a). A defendant may be released on personal recognizance or an unsecured appearance bond, or, if necessary to assure the appearance of the defendant and safety of the community, release may be subject to conditions. 18 U.S.C § 3142(b) and (c). If no condition or combination of conditions will reasonably assure the appearance of the defendant or safety of the community, the judicial officer shall order that the defendant be detained prior to trial. 18 U.S.C.

---

2   The government filed the motion for a stay and for a de novo hearing only at Criminal No. 15-22. In determining whether Kulikowski should be detained, however, the magistrate judge considered the allegations contained in the criminal complaints at both cases. At the de novo hearing, this court also considered the allegations at both criminal numbers.

§ 3142(e). In certain cases, a rebuttable presumption that no conditions or combination of conditions will reasonably assure the appearance of defendant as required or the safety of the community applies. 18 U.S.C. § 3142(e)(3). This rebuttable presumption applies, among others, to cases in which there is probable cause to believe that the defendant committed an offense under 18 U.S.C. § 924(c) or an offense under the Controlled Substances Act, 21 U.S.C. §§ 801–904, for which the maximum term of imprisonment is ten years or more. 18 U.S.C. § 3142(e)(3).

If the presumption applies, the defendant must "produce some credible evidence forming a basis for his contention that he will appear and will not pose a threat to the community." *United States v. Carbone*, 793 F.2d 559, 560 (3d Cir. 1986) (per curiam). This burden of production is "relatively light." *United States v. Chagra*, 850 F. Supp. 354, 357 (W.D. Pa. 1994). The factors to be considered by the court in determining whether the defendant has rebutted the presumption are set forth in 18 U.S.C. § 3142(g). *Carbone*, 793 F.2d at 561. The four factors are

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including—
>
>    (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>
>    (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

If the presumption is rebutted, the government must show that no condition or combination of conditions would reasonably ensure the appearance of the defendant or safety of the community if defendant were to be released. 18 U.S.C. § 3142(f). Proving that the defendant poses a danger to the community requires clear and convincing evidence. *Id.* With respect to proving that the defendant is a flight risk, the government's burden is a preponderance of the evidence. *United States v. Himler*, 797 F.2d 156, 161 (3d Cir. 1986). The factors in 18 U.S.C. § 3142(g) guide the court's analysis. *Id.* The rebutted presumption retains evidentiary weight. *United States v. Dillon*, 938 F.2d 1412, 1416 (1st Cir. 1991).

Applying the above standards, the court reviews the magistrate judge's detention decision de novo. *United States v. Delker*, 757 F.2d 1390, 1394 (3d Cir. 1985).

**III. Discussion**

The rebuttable presumption "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community" applies at both criminal numbers. 18 U.S.C. § 3142(e)(3). An indictment charging a defendant with violation of an offense enumerated in 18 U.S.C. § 3141(e)(3) is sufficient to establish probable cause triggering the rebuttable presumption. *United States v. Suppa*, 799 F.2d 115, 119 (3d Cir. 1986). The indictment at Criminal No. 15-19 charges Kulikowski with conspiracy to possess with the intent to distribute and distribute five kilograms or more of cocaine. The rebuttable presumption applies to this charge because it an offense under the Controlled Substances Act for which the maximum term of imprisonment is ten years or more. 21 U.S.C. § 841(b)(1)(A) (maximum term of imprisonment is life). The indictment at Criminal No. 15-22 charges Kulikowski with conspiracy to commit a Hobbs Act robbery and possession of a firearm in furtherance of a crime of violence. Possession of a firearm in furtherance of a crime of violence is a violation of 18 U.S.C. § 924(c),

4

which triggers the rebuttable presumption. 18 U.S.C. § 3142(e)(3)(B).[3] Although the magistrate judge did not find probable cause to support the § 924(c) charge at the preliminary examination, the subsequent return of an indictment by the grand jury establishes probable cause for that charge. *Suppa*, 799 F.2d at 119.

### A. Evidence Before the Magistrate Judge

At the hearing before the magistrate judge, the government proffered the testimony of Robert Kavals ("Kavals"), a detective with the Pittsburgh Bureau of Police who was assigned to the Drug Enforcement Agency as a task force officer. The criminal charges against Kulikowski were the product of a large-scale investigation of suspected drug trafficking in the Western District of Pennsylvania. (Prelim. Ex. Hr'g Tr. 5:7–12, ECF No. 44-1.) The investigation focused on the members of a motorcycle club called the LAW, which is an acronym for "Lords Among Warriors." (*Id.* at 5:17–21.) The investigation took place over several months and involved Title III telephone intercepts, physical and remote surveillance, and confidential informants. (*Id.* at 6:10–15.) Kavals was one of the prime monitors of the wiretaps during the investigation. (*Id.* at 4:20–23.)

#### 1. Government's Evidence About Drug Conspiracy Charge

The government proffered that it recorded Kulikowski's codefendant Raymond Kober ("Kober") speaking about Kulikowski. Kober stated on the recording:

---

3  At the hearing before the magistrate judge, the government argued that the Hobbs Act conspiracy also triggered the application of the rebuttable presumption because it is a crime of violence. (Prelim. Ex. Hr'g Tr. 112:1–10, ECF No. 44-1.) Upon motion of the government, the court must hold a detention hearing in a case that involves "a crime of violence … for which a maximum term of imprisonment of 10 years or more is prescribed." 18 U.S.C. § 3142(f). A case involving a crime of violence does not, however, implicate the rebuttable presumption set forth in § 3142(e)(3), except for those offenses specifically enumerated in § 3142(e)(3)(A)–(E). Hobbs Act robbery, 18 U.S.C. § 1951, is not one of the enumerated offenses. *See United States v. Coleman*, Crim. No. 01-77, 2001 WL 1249682, at *4 (N.D.N.Y. July 24, 2001) ("The mere fact that the defendant is charged with a crime of violence entitling the government to a detention hearing under 18 U.S.C. § 3142(f)(1) alone does not suffice to trigger such a presumption.").

> [H]e has me re-up it for him. He's getting shit that's already turned, one into three, one into four. Sometimes he'll take two grams out and he'll have me one-on-one on that. And then later, he used to pay me $100 every time. The last couple times he lost track, I guess. I guess I do it for free now, and he will take a couple of grams out, have me double it. So if he has two, he leaves here with four.

(*Id.* at 7:3–11.) The government intercepted a call between Kulikowski and Robert Johnson ("Johnson"). Kulikowski expressed concern about the number of people coming in and out of Kober's house. (*Id.* at 18:6–18.) Kulikowski stated, "I say within the next six months we get hit with RICO." (*Id.* at 18:15–16.) On cross-examination, Kavals testified that he was aware of "five or six" calls between Kulikowski and Kober regarding drug trafficking activity. (*Id.* at 45:8–13.) There was no proffer or testimony about the contents of these conversations.

In July 2014, there was a controlled purchase of four-and-a-half ounces of cocaine from Kober. (*Id.* at 6:15–19.) Agents conducted a search of Kulikowski's house on January 12, 2015, and recovered a firearm from his LAW motorcycle vest and two digital scales. (*Id.* at 19:22–25.)

    2.   *Government's Evidence About Robbery Conspiracy and Firearm Charges*

The government proffered that there were a number of calls intercepted between Kulikowski and his codefendants, Kober and Christopher Levy ("Levy"). On September 7, 2014, Kulikowski told Levy that a business in the Strip District neighborhood of Pittsburgh had a large sum of cash on the premises. (*Id.* at 8:18–9:22.) Kulikowski told Levy that an employee of the business would not fight "[i]f you go in there like you're going to go in." (*Id.* at 9:5–6.) Levy responded, "I got to find me a little shotgun I had lying around." (*Id.* at 9:7–8.) On the night of September 7, 2014, Kober told Levy to "be careful tomorrow, if you do that other thing. Don't be stupid. If it don't look right. Don't do it." (*Id.* at 9:13–16.)

On September 8, 2014, police officers followed Levy as he left his house and proceeded to the location of the business. When Levy was approximately a couple of blocks away from the business, police stopped him. (*Id.* at 9:22–25.) When Levy was

stopped, police observed him trying to hide a gun, which was recovered when police searched the vehicle. (*Id.* at 9:25–10:4.) At the time, Levy was the subject of a protection from abuse ("PFA") order that prohibited him from possessing a firearm. (*Id.* at 10:4–6.)

Levy was taken into custody, but was granted bail on the state firearms charge. Soon after Levy was released, he called Kulikowski and said, "I fumbled the ball on that one. Dude, they got me a block away." (*Id.* at 11:3–4.) Levy additionally told Kulikowski that he would call the subject of the protection from abuse order and tell her to drop it. (*Id.* at 16:19–25.) He said, "She got to drop this PFA. That's the only thing holding me right now, that PFA; the gun and all that." (*Id.*) On January 12, 2015, police executed a search warrant at Levy's home and recovered a pistol and an "AK-47 style assault rifle." (*Id.* at 19:19–21.)

### 3. Evidence Presented by Kulikowski

Kulikowski's wife, Connie Kulikowski, testified that she and Kulikowski have been married for ten years and resided in Allegheny County, Pennsylvania, during that period. (*Id.* at 65:1–14.) There are five children in the Kulikowski household, and Kulikowski is actively involved in their lives. (*Id.* at 66:24, 74:7–17.) Connie Kulikowski testified she was experiencing a difficult, high-risk pregnancy and that Kulikowski managed all the affairs of the household, including taking care of the children and preparing dinner. (*Id.* at 67:8–69:6.)

Kulikowski started his own towing business, but the business was having financial difficulties. Kulikowski earned approximately $800 per month from the towing business. (*Id.* at 70:2–4.) Due to the lack of income, Connie Kulikowski receives government aid in the form of food stamps. (*Id.* at 72:14–24.) Kulikowski's mother and mother-in-law have been paying the bills for the Kulikowskis.

Kulikowski does not have a passport and he is close to his mother and sister, who also reside in Allegheny County. (*Id.* at 70:16–71:18.)

### B. *Evidence at the Hearing Before the District Court*

#### 1. *Evidence Presented by Kulikowski*

Because of the rebuttable presumption, Kulikowski presented evidence first. Connie Kulikowski testified about Kulikowski's family life, ties to the community, and towing business. This testimony was substantially similar to the testimony she gave at the hearing before the magistrate judge. She testified that after the previous hearing, she lost the pregnancy. (De novo Hr'g Tr. 14:8–20, Feb. 10, 2015, ECF No. 66.) This miscarriage, coupled with Kulikowski's incarceration, placed a great strain on the family and its finances. Connie Kulikowski's mother and mother-in-law have supported them financially and by helping with the children and chores. (*Id.* at 15:5–21.) If released, Kulikowski would work for a construction business operated by Connie Kulikowski's uncle or a bricklaying business operated by Kulikowski's cousin in addition to the towing company. (*Id.* at 16:3–14.) Kulikowski has type 2 diabetes and high blood pressure, for which he takes medication. (*Id.* at 19:3–8.)

#### 2. *Government's Evidence About Drug Conspiracy Charge*

The government supplemented the record before the magistrate judge by proffering additional testimony from Kavals. The government proffered that Kulikowski was a member of the LAW motorcycle club and part of the club's "mother chapter." (*Id.* at 48:21–25.) Members of the mother chapter are the directors of the club. Kulikowski belonged to a subset of the club called "D12," which is the enforcement arm of the club responsible for committing criminal acts in furtherance of the club. (*Id.* at 48:25–49:2.) Kober told a confidential informant that Kulikowski, Levy, and he do all the "work" for the club. (*Id.* at 58:10–16.) The government proffered that Kavals would testify, based upon his law enforcement experience, that "work" in this context means "acts of violence and harm." (*Id.* at 58:22–24.) Kober told the informant that there is an initiation requirement to become a member of D12: "You got to do something first to get in. They'll make you do something. I don't know. Blow a car up, do something stupid, beat somebody up bad or something." (*Id.* at 58:17–21.)

The government proffered the contents of additional intercepted phone calls between Kulikowski and Kober. In a call on August 15, 2014,

> Mr. Kulikowski said, "Well, like around one or two in the afternoon can you make me one thing of wings?"
>
> To which Mr. Kober responded, "Yeah, I could do that."
>
> Kulikowski said, "Yeah. I just need— I just need— I got a half order. I just want to turn it into a whole. That's it."
>
> To which Mr. Kober responded, "Uh, I'll probably get up around eleven tomorrow. So I'll just call you when I get up."
>
> To which Mr. Kulikowski then stated, "Times are— times are tough, dude. Fucking I lost all my people except fucking Q-Tip, and he's fucking slower than dirt."

(*Id.* at 50:6–16 (punctuation altered).) The government proffered that Kavals knows that "Q-Tip" is an alias for Joe Pearson, who received cocaine from Kulikowski and distributed it in the Pittsburgh area. (*Id.* at 50:17–21.)

On September 27, 2014, Kulikowski received a call from an unknown male. In this call, Kulikowski discussed purchasing oxycodone pills. (*Id.* at 51:1–20.) Subsequently, the government intercepted a call between Kulikowski and Levy in which Kulikowski attempted to sell prescription pills to Levy. (*Id.* at 51:21–24.)

### 3. *Government's Evidence About Robbery Conspiracy and Firearms Charges*

In an intercepted call between Levy and Kulikowski on September 7, 2014, Kulikowski told Levy that he saw $10,000 to $15,000 in cash at a business in the Strip District neighborhood of Pittsburgh. (*Id.* at 53:21–54:5.) Later in that conversation,

> Mr. Kulikowski said, "I mean— just be honest what you get out of there, and then I obviously will give you more because you are doing it."
>
> To which Levy responded, "Yeah. No. You know that. I ain't going to— you know what I mean. Soon as I get out of it and get to the car, I will call you with a number."
>
> Mr. Kulikowski responded, "Yeah. And obviously you will get more. You know what I mean."

> To which Levy responded, "mmm-hmm, mmm-hmm, mmm-hmm."

(*Id.* at 55:2–10 (punctuation altered).)

The next day at approximately 1:20 p.m., Kulikowski told Levy,

> "I mean it is up to you. Like, I mean, I went Friday. I went Friday around 2:00, and it was dead in there with just him and his mom."
>
> Mr. Levy responded, "Just them two?"
>
> Response: "It was just them two, yeah."
>
> Levy then said, "Shit. I might just go in then now then."

(*Id.* at 54:14–20.) Several minutes after this, the government intercepted text messages from Kulikowski to Levy that said, "Make sure inks covered," and, "Long sleeves." (*Id.* at 54:23–24.) Several minutes later, police arrested Levy about two blocks away from the targeted business. Police found a loaded firearm in Levy's vehicle. (*Id.* at 55:11–15.)

Minutes after Levy's arrest, the government intercepted a call between Kulikowski and Sabri Shannon ("Shannon"), Levy's girlfriend. In that call, Kulikowski instructed Shannon to erase the text messages between Kulikowski and Levy from the morning. (*Id.* at 55:16–21.) Kulikowski said,

> "Yeah, I know. But do me a favor. Go into your phone and erase text messages and everything because someone just called me. He got caught."
>
> "What?"
>
> "He got caught."
>
> "Who? Levy?"
>
> "Yeah."
>
> "What do you mean, he got caught?"
>
> "I don't know. He's getting arrested on Smallman Street. I don't know what the fuck he did, but he did something."

10

> Continuing, "No. I'll— I'll call— I'll call whoever. Just do me a favor. The text messages between me and him this morning, erase."
>
> To which she responded, "I'll delete them."

(*Id.* at 55:22–56:11.)

Later that evening, Kulikowski called Kober to discuss the firearm police seized from Levy. Kulikowski said, "Yeah. I know. That's the thing I gave them. I got that from Geno. So I don't know how the hell that's going to go through." (*Id.* at 56:18–20.) The government argued that Kulikowski and Kober were discussing a firearm and indicating that Kulikowski had at some point given the firearm to Levy. (*Id.* at 56:21–22.)

After Levy was released from custody, he called Kulikowski. Levy said,

> "Man, I fumbled it on this one."
>
> Mr. Kulikowski responded, "What?"
>
> "I fumbled the ball on that one. And dude, they got me a block away."
>
> Mr. Kulikowski: "Yeah. It's all right."
>
> Mr. Levy: "Man, I'm kind of upset with myself with that one."
>
> To which Kulikowski said, "Yeah. We'll talk about it. Don't mean it still can't be done."

(*Id.* at 56:25–57:7.)

In a later call, Kulikowski told Levy that the business they were targeting was getting a safe installed in the floor and would no longer have large amounts of cash on hand. (*Id.* at 57:17–25.) Kulikowski said, "So that's out the door now." (*Id.* at 57:23.) Levy responded, "Nah-ah. I can— I can still get him to open that up." (*Id.* at 57:24–25.) Kulikowski told Levy to wait until he had a chance to see what was happening. (*Id.* at 58:1–9.)

11

### C. Rebuttable Presumption

#### 1. Risk of Flight

The court found, based upon the information in the pretrial services report and the evidence presented, that Kulikowski rebutted the presumption that he was likely to flee. He does not own a passport, has resided in Allegheny County his entire life, and has never traveled outside the United States. He lives with his wife and children and has strong family ties to the community. "The purpose of a Section 3142(e) risk of flight determination … is to secure the appearance of the accused at trial." *Himler*, 797 F.2d at 161–62; *see United States v. Maull*, 773 F.2d 1479, 1488 (8th Cir. 1985) (en banc) (finding risk of flight shown by numerous connections to people living abroad, possession of a passport hidden in a light fixture in his house, and previously using false identification to escape prosecution in a different county); *United States v. Vortis*, 785 F.2d 327, 330 (D.C. Cir. 1986) (finding risk of flight shown by possession of thirteen United States passports of other people and a planned trip to Liberia). The government did not present sufficient evidence to show, by a preponderance of the evidence and considering the evidentiary weight of the rebutted presumption, that Kulikowski was a risk of flight.

#### 2. Safety of the Community

With respect to the rebuttable presumption that no condition or conditions of release would reasonably assure the safety of the community, it is a close call. The court cannot conclude that the information presented rebutted the presumption. The court, however, will assume for the purpose of this opinion that the presumption was rebutted and will discuss whether the government adduced clear and convincing evidence that Kulikowski would pose a danger to the community if released.

### D. Clear and Convincing Evidence of Danger to Community

Even if the presumption were rebutted, it retains evidentiary weight. *Dillon*, 938 F.2d at 1416. After reviewing the record before the magistrate judge and the additional evidence submitted at the de novo hearing, the court concludes there is

clear and convincing evidence that no condition or conditions of release would assure the safety of the community.

1. *The Nature and Circumstances of the Offenses Charged*

The drug conspiracy charge involves a substantial quantity of illegal drugs—five kilograms of cocaine. Trafficking illegal drugs on this scale is a serious crime that carries a mandatory minimum term of imprisonment ten years. 21 U.S.C. § 841(b)(1)(A). Possession of a firearm in furtherance of a crime of violence is a serious offense, which Congress recognized by including this crime among those to which the rebuttable presumption applies. A Hobbs Act conspiracy to commit robbery is also a serious crime that "by definition … involves a substantial risk that physical force may be used against the person or property of another." *United States v. Elder*, 88 F.3d 127, 129 (2d Cir. 1996).

Courts have found that nature of the offenses of conspiracy to commit armed robbery and possession of a firearm in furtherance of a crime of violence weigh heavily against release. *United States v. Mercedes*, 254 F.3d 433, 437 (2d Cir. 2001); *United States v. Coleman*, Crim. No. 01-77, 2001 WL 1249682, at *4 n.2 (N.D.N.Y. July 24, 2001) ("Congress has made it clear that the nature of the crime as one of violence is an important consideration, particularly on the issue of dangerousness."). The text of the statute also instructs the court to consider "whether the offense is a crime of violence … or involves a … firearm." 18 U.S.C. § 3142(g)(1). In this case, the offenses involved a firearm and violence.

2. *The Weight of the Evidence Against the Person*

Based upon the criminal complaint, the indictment, the intercepted phone calls, the recordings made by the confidential informant, and the other evidence presented at the hearings, the court finds that the weight of the evidence is fairly strong with respect to the drug trafficking charge. In particular, the phone conversation concerning "wings" was about drug trafficking, based upon the government's proffer and the testimony of Kavals. From this call, and the others proffered by the

government, there is clear and convincing evidence that Kulikowski was involved in the conspiracy.

With respect to the robbery conspiracy, the court finds the weight of the evidence to be fairly strong. The calls between Kulikowski and Levy are evidence of planning and coordination between them. Specifically, Kulikowski told Levy about the cash he saw at the business, and they discussed how they would split the proceeds of the planned robbery. Kulikowski told Levy that there were not many people at the business and that he would not face determined resistance. Shortly after that call, Levy, armed with a loaded gun, got in his car and drove toward the target business before being stopped by police two blocks away. After learning that Levy had been arrested, Kulikowski asked Levy's girlfriend to delete incriminating text messages Kulikowski sent to Levy before the attempted robbery.

The weight of the evidence with respect to the charge for possession of a firearm in furtherance of a crime of violence is not particularly strong. The government proffered one call between Kulikowski and Kober that the government asserted is evidence that Kulikowski gave Levy the gun that was seized in the arrest. While this call is some evidence that Kulikowski possessed the firearm, it is not as strong as the evidence with respect to the other two charges.

### 3. *The History and Characteristics of the Person*

Kulikowski has strong family ties to his wife and children, particularly in light of his wife's health condition. He is also strongly connected to his mother and other family members. He has ties to the community as he lived in the community his entire life. The main issue in this case is the risk of danger to the community, not the risk of flight. Therefore, evidence of community ties is "of limited weight." *United States v. Delker*, 757 F.2d 1390, 1396 (3d Cir. 1985). Evidence was presented that Kulikowski's tow truck business financially struggled. Based upon the pretrial services report, his monthly income was negative.

As detailed in the pretrial services report, Kulikowski had two previous arrests, but the charges were summary offenses or dropped. Overall, his criminal history is

not significant. Kulikowski has some health issues, including diabetes, high blood pressure, and back pain, but these are manageable conditions and are not overly significant in terms of health risk.

    4. *Danger to the Community*

Drug trafficking represents a danger to the community. *United States v. Strong*, 775 F.2d 504, 507 (3d Cir. 1985) (concluding that "Congress intended to equate drug trafficking with danger to the community"). Specifically, the danger to the community is the likelihood that the defendant will, if released, traffic in illicit drugs. *United States v. Perry*, 788 F.2d 100, 111 (3d Cir. 1986). The combination of drugs and guns constitutes a very serious danger to the community. *United States v. Pitts*, Crim. No. 09-204, 2010 WL 3303800, at *4–5 (W.D. Pa. Aug. 19, 2010).

The court concludes that there is a likelihood Kulikowski would engage in drug trafficking if released. In particular, the seriousness and scale of the drug trafficking conspiracy and Kulikowski's lack of financial resources implicate that Kulikowski would return to drug trafficking. Kulikowski's possession of a firearm, even if otherwise legally possessed, creates a very serious risk of danger when combined with drug trafficking.

Participation in a robbery conspiracy is also cause for concern. Robbery inherently involves violence or the risk of violence. *Elder*, 88 F.3d at 129. Even after the first attempt resulted in Levy's arrest, Kulikowski told Levy that it could still be done. A willingness to engage in violence and a need for money creates a substantial danger to the community.

## IV.    Conclusion

Considering the above factors and the totality of the circumstances, the court concludes that no condition or set of conditions would assure the safety of the community if Kulikowski were released pending trial. Even if the presumption was rebutted, the government met its burden to show by clear and convincing evidence that Kulikowski poses a risk of danger to the community. The nature and

circumstances of the offenses and the history and characteristics of the defendant, including his lack of financial resources, led the court to conclude that Kulikowski's release would create an unjustifiable risk of danger to the community. The court considered the weight of the evidence against Kulikowski and the presumption that no conditions would assure the safety of the community, which retains evidentiary weight even if rebutted. For these reasons, the reasons stated on the record, and the other reasons stated above, Kulikowski will be detained pending trial.

    The government appealed the magistrate judge's order setting conditions of release only at Criminal No. 15-22. After the court determined that Kulikowski should be detained on that charge, Kulikowski filed a motion (ECF No. 66) to revoke the order of pretrial release at Criminal No. 15-19. The court will grant this motion and will enter orders of detention in both cases.

| | |
|---|---|
| Dated: March 30, 2015 | /s/ Joy Flowers Conti<br>Joy Flowers Conti<br>Chief United States District Judge |